## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| ERBERT & GERBERT'S, INC., | |
| Plaintiff, | Case No.  0:20-cv-1414 |
| v. | |
| JBS USA FOOD COMPANY HOLDINGS, TYSON FOODS, INC., CARGILL, INC., and NATIONAL BEEF PACKING COMPANY, | **CLASS ACTION COMPLAINT** |
| Defendants. | |
| | **<u>DEMAND FOR JURY TRIAL</u>** |

## TABLE OF CONTENTS

**Page**

I.     NATURE OF ACTION ........................................................................................ 1

II.    JURISDICTION AND VENUE .......................................................................... 6

III.   PARTIES ............................................................................................................ 7

       A.     Plaintiff ................................................................................................... 7

       B.     Defendants .............................................................................................. 8

IV.    TRADE AND COMMERCE.............................................................................. 9

       A.     Beef Distribution Chain ......................................................................... 9

       B.     Structure of the Beef Industry................................................................ 9

              1.     The Beef Meatpacking Industry is Highly Concentrated. ................. 10

              2.     The Meat-Packing Market Features High Barriers to Entry................ 11

              3.     Beef is a commodity product. .............................................................. 12

              4.     The Demand for Beef is Inelastic. ....................................................... 12

V.     VIOLATIONS ALLEGED................................................................................ 13

       A.     Defendants Agreed to Reduce Slaughter Volumes.............................. 13

       B.     The Agreement Resulted in Significantly Reduced Slaughter Volumes by the
              Defendants during the Class Period................................................. 16

       C.     Defendants Closed or Idled Plants, and Refrained from Expanding. ............. 17

       D.     Defendants Publicly Signaled Each Other to Keep Slaughter and Capacity
              Restrained. ........................................................................................ 21

       E.     The Collusive Agreement to Reduce Resulted in an Increased Spread Between
              the Fed Cattle and Beef Prices. ....................................................... 26

       F.     Tyson and JBS Attribute Their Record 2017 & 2018 Profits to "Visibility" into
              the Beef Supply Chain. ..................................................................... 27

VI.    ADDITIONAL FACTORS SUPPORTING THE EXISTENCE OF DEFENDANTS'
       CONSPIRACY ................................................................................................ 29

       A.     Defendants Took Advantage of Numerous Opportunities to Collude............. 29

B.      The Defendants Supply Restraints Were Not Offset and Were Further Exacerbated by Reductions in Imports. ............................................................ 31

C.      Overcharges due to the cartel were passed through to the indirect purchaser class.................................................................................................................... 32

D.      The Defendants actively concealed the conspiracy. ......................................... 33

E.      The Defendants' conspiracy continues through the present. ............................ 40

VII.    CLASS ACTION ALLEGATIONS ............................................................................... 41

VIII.   ANTITRUST INJURY .................................................................................................. 44

IX.     CAUSES OF ACTION ................................................................................................. 45

REQUEST FOR RELIEF .......................................................................................................... 75

JURY TRIAL DEMANDED ...................................................................................................... 77

Plaintiff brings this action on behalf of itself individually and on behalf of a plaintiff class consisting of all commercial and institutional indirect purchasers of beef that purchased beef other than directly from defendant or co-conspirator in the United States from at least January 1, 2015 until the present (Class Period). Plaintiff brings this action for injunctive relief under Section 1 of the Sherman Act, and for treble damages under the antitrust laws, unfair competition laws, consumer protection laws, and unjust enrichment common laws of the several states against defendants, and demand a trial by jury.

## I.      NATURE OF ACTION

1.      This is an antitrust class action for injuries sustained to the business and property of Plaintiff and the members of the Plaintiff Class from Defendants' violations of Section 1 of the Sherman Act, and for treble damages under the antitrust laws, unfair competition laws, consumer protection laws, and unjust enrichment common laws of several states.

2.      From at least as early as 2015 through the present, the Defendants entered into a combination, contract or conspiracy to fix, maintain and raise the price of Beef to supracompetitive levels. They engaged in their scheme using mechanisms that included suppressing throughput of fed cattle[1] thereby creating artificial Beef supply restraints. The conspiracy to suppress the throughput of fed cattle led to Beef prices paid by Plaintiff and commercial and institutional indirect purchaser class members being higher than they otherwise would have been in a competitive market.

3.      Beef is meat from full-grown cattle that is approximately 2 years old. "Boxed beef" is a combination of cuts subject to USDA grading. Price is the primary competitive factor. "Beef"

---

[1] Fed cattle are steers and heifers raised and fed for the production and sale of high-quality beef products. Fed-cattle does not include culled cows, which are primary used for dairy production, and then at the end of their dairy producing life, are slaughtered for lower quality ground beef.

for purposes of this complaint is defined as "boxed beef" and case ready cuts, and does not include ground beef from culled cows.

4.      The four Defendant families are the largest meatpacking companies in the world.

5.      Defendants' scheme succeeded, in part, due to the structure of the Beef industry. The Defendants purchase fed cattle from farmers, process it into Beef, and sell the Beef downstream. Slaughter and packing are essential parts of the Beef supply chain.

6.      The Defendants account for over 80% of the Beef supplied to the wholesale market, thus collectively controlling a crucial component of the distribution chain. The meatpacking industry, therefore, is highly concentrated. This high industry concentration affords the Defendants market power with respect to both upstream fed cattle purchases and downstream Beef sales. As the "big four" players in this highly concentrated industry, the Defendants interact frequently at industry events and trade association meetings, and their respective executives are well-acquainted. The market is therefore highly conducive to collusion. Plaintiffs in several other actions have alleged the existence of a confidential informant. On information and belief on the basis of the allegations found in related actions, Plaintiff makes the following and all subsequent allegations relating to the confidential witness: the existence of the Defendants' conspiracy is confirmed by at least one confidential witness account. A confidential witness previously employed by a Packing Defendant ("Witness 1"), has confirmed that each of the Defendants expressly agreed to reduce their respective purchase and slaughter volumes, which would have the effect of artificially raising the price of Beef. Witness 1's account is corroborated by transactional data and slaughter volume records reported by Defendants and published by the United States Department of Agriculture ("USDA"), as well as Defendants' public calls for industry-wide slaughter and capacity reductions.

7.     Defendants engaged in periodic and parallel slaughter reductions throughout the Class Period. The impact of Defendants' respective slaughter reductions upon their annual slaughter volumes is illustrated in the below figure. This figure compares the average annual slaughter volume of the Defendants during the pre-Class Period and the portion of the Class Period for which data exists against that of the other US beef packers. It shows that Defendants all reduced their annual slaughter volumes relative to the pre- Class Period, while independent regional packing businesses ("Independent Packers") increased their slaughter volume.



8.     The Defendants' profitability is driven by the "meat margin," which is the spread between the price packers pay for fed cattle and the price they charge for Beef. As the supply of fed cattle is insensitive to short-term changes of price – owing to the long life cycle of fed cattle, their perishable nature, and their lack of any alternative use – and as Beef demand is relatively insensitive to changes in price, the meat margin is very sensitive to changes in aggregate industry

slaughter levels. A collusive restraint on the volume of the purchase of fed cattle naturally creates an artificial restraint on the supply of Beef. This decrease in purchase and throughput has the effect of artificially suppressing the prices paid for fed cattle and artificially raising the price of Beef above the levels which would prevail in a freely competitive market. The Defendants, in this way, increased the meat margin, and thus their profitability, by working cooperatively to reduce their respective slaughter volumes.

9.     The Beef market saw a marked change in pricing practices in 2015. Before 2015, the prices of fed cattle and Beef moved in tandem: as one would expect, lower cattle prices usually led to correspondingly lower wholesale Beef prices. After 2015 when Defendants collusively cut production, however, this fundamental economic relationship was altered. Suddenly, the degree of correlation of cattle and Beef prices diverged to the benefit of the Defendants, and without credible explanation. The relevant supply and demand factors in the industry no longer explained the prices being seen by purchasers. Wholesale Beef prices showed unusual trends starting in 2015. The per pound price of cattle had historically stayed within 20 to 40 cents of the per pound wholesale price of Beef on average, but in 2015, the spread between those prices increased dramatically, as seen on the chart below.



10.     There was a steep decline in the price of fed cattle starting in 2015 where meatpackers did not purchase as much of the farmers' fed cattle inventory. But wholesale and other prices remained high relative to the price of fed cattle. This incongruous pricing trend continued into 2016: although cattle prices had fallen to pre-2014/2015 levels, wholesale and other Beef prices remained high relative to cattle prices. Defendants' burgeoning meatpacker cartel had realized that if no meatpacker "broke rank" to increase throughput of fed cattle to the unmet demand for beef, the "big four" could increase their profitability by achieving and maintaining unprecedented high wholesale prices relative to fed cattle prices.

11.     The Defendants' conspiracy and exercise of their market power in both the upstream and downstream markets allowed them to grow their operating margins steadily from 2015 through 2018. By the end of 2018, Tyson and JBS, the two publicly traded Beef packers, were reporting record operating margins in their beef business. That year, Tyson reported beef

business operating margins of nearly 7 percent,[2] almost double its 2014 operating margins, and JBS reported beef business margins of 10.2 percent.[3] As industry reporter Cassandra Fish noted at the time, the Defendants "no longer compete[d]" and were enjoying "gangbuster profits."[4]

12.    Aside from the information provided by Witness 1, numerous "plus factors" support the inference of collusion by the meatpackers during the Class Period, including high barriers to entry, high industry consolidation and concentration, inelastic supply and demand, unusual market share stability, economic factors that are consistent with the existence of a horizontal conspiracy, a homogenous product, and ample opportunities to conspire.

13.    Because of Defendants' unlawful conduct, Plaintiff and the commercial and institutional indirect purchaser class paid artificially inflated prices for Beef during the Class Period, and Beef prices during the Class Period were greater than they otherwise would have been in a competitive market. Plaintiff and class members therefore suffered antitrust injury and injury to their business or property because of Defendants' illegal conduct.

## II.    JURISDICTION AND VENUE

14.    Plaintiff brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief against defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiff also brings these state law class claims on behalf of all the classes to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by defendants' conduct in restricting the supply of beef and increasing the price of beef. Plaintiff seeks damages in excess of $5,000,000.

---

[2] Tyson November 13, 2018 Q4 Earnings Call.

[3] JBS August 15, 2018 Q2 Earnings Call.

[4] Cassandra Fish, "Whatever Happened to a Fair Fight," The Beef (Nov. 10, 2015), https://www.thebeefread.com/2015/11/10/whatever-happened-to-a-fair-fight/.

This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

15.     Venue is appropriate in this District under 28 U.S.C. § 1391(b), (c) and (d) because one or more defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

16.     This Court has personal jurisdiction over each defendant because, *inter alia*, each defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of beef throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

17.     The activities of the defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.

### III.   PARTIES

**A.   Plaintiff**

18.     Plaintiff Erbert & Gerbert's, Inc., operates a sandwich shop in Eau Claire, Wisconsin. During the Class Period, Plaintiff purchased beef in Wisconsin, once or more, other than directly from Defendants, entities owned or controlled by Defendants, or other producers of beef. The beef purchased by Plaintiff was impacted by the conduct of one or more of the

Defendants, constituting an antitrust violation as alleged herein, and plaintiff suffered monetary loss as a result of the antitrust violations alleged herein.

**B.    Defendants**

19.    Cargill, Incorporated (Cargill) is a privately held Delaware corporation headquartered in Minnetonka, Minnesota. During the Class Period, Cargill and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

20.    JBS USA Food Company Holdings (JBS USA) is a subsidiary of Brazilian-based JBS SA. JBS Food Company Holdings is a Delaware corporation, headquartered in Greeley, Colorado. JBS USA Food Company Holdings holds a 78.5 percent controlling interest in Pilgrim's Pride Corporation, one of the largest chicken-producing companies in the world. During the Class Period, JBS USA and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

21.    Tyson Foods, Inc. (Tyson) is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. During the Class Period, Tyson and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

22.    National Beef Packing Company (National Beef) is a privately owned Delaware corporation headquartered in Kansas City, Missouri. National Beef and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

## IV.    TRADE AND COMMERCE

**A.    Beef Distribution Chain**

23.    The Beef value chain includes four stages: (1) ranch and farm grazing, (2) feedlot, (3) meatpacking, and (4) wholesale/distribution and foodservice and retail.

24.    In the first stage, ranches and farms birth and raise cattle. There are hundreds of thousands of ranching operations in the United States, and as many as 90% are family-owned or individually operated.[5]

25.    In the second stage, feedlots engage in intensive feeding that raise the weight of cattle prior to sale. Once cattle reach between 950 and 1,500 pounds, they are sold to meatpacking operations as "fed cattle."

26.    In the third stage, the Defendants and other producers purchase and transport fed cattle to a packing plant for slaughter and processing into various cuts the meatpackers sell as "boxed beef" to various purchasers, such as distributors, large retailers, and foodservice operations.

27.    Distributors, large retailers, and foodservice operations purchase processed Beef and sell it to other, smaller commercial and institutional indirect purchasers or consumers. Large resellers may include supermarkets and wholesalers, such as Sysco, US Foods, Costco, and Sam's Club.

**B.    Structure of the Beef Industry**

28.    Defendants' conspiracy to maintain supracompetitive Beef prices was facilitated by the structure of the meatpacking market. The Beef meatpacking industry has all the hallmark features of a market that is susceptible to cartelization, including high concentration,

---

[5] *Available at* http://www.beefusa.org/beefindustrystatistics.aspx.

commoditization, and inelastic demand. Concern over anticompetitive conduct by Beef processors was a leading driver for the initial passage of the Sherman Act, as the Federal Trade Commission reminded the public in 2008.[6]

**1.    The Beef Meatpacking Industry is Highly Concentrated.**

29.    Market concentration facilitates collusion. Collusive agreements are easier to implement and sustain where a few firms control much of the market. Practical matters, such as coordinating cartel meetings and exchanging information, are easier when there are fewer members of the cartel. A high degree of market concentration simplifies coordination because there is little outside competitive presence to undermine the cartel. Additionally, with fewer members in a cartel, it is easier for cartel participants to monitor each other's actions related to supply and pricing. And with fewer firms in the market, the short-term gains that might be achieved by undercutting the cartel price and gaining a short-term increase in market share would be outweighed by the greater long-term profits for colluding firm in a concentrated industry with artificially increased prices.

30.    By contrast, if an industry is divided into a large number of small firms, the current gain from cheating the cartel is large relative to the firm's possible gains from the cartel's continuing future success (*i.e.*, the profits from sales captured from other cartel members through

---

[6] *See* Note by the United States, pg. 1 Roundtable on Monopsony and Buyer Power, October 13, 2008 ("The 1890 debates in both houses of the United States Congress demonstrated concern with the exercise of market power on both the buying and selling sides of the market. Many legislators singled out large meat packers for condemnation, and they were condemned as much for reducing the prices paid to cattle farmers as for raising prices to consumers. In response, Congress passed the Sherman Act, "aimed at preserving free and unfettered competition as the rule of trade." "The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated.") (available at https://www.ftc.gov/sites/default/files/attachments/us-submissions-oecd-and-other-international-competition-fora/monopsony.pdf).

undercutting of the cartel-fixed price in the current time period, which risks causing the cartel to fall apart in the future are greater than the firm's future share of the total cartel profits if collusion were to continue successfully).

31.     The Beef industry experienced increased market concentration leading up to and during the Class Period. In 2001, Tyson purchased IBP, then the United States' largest Beef packer. In 2002, Cargill purchased another Beef packer, Taylor Packing. In 2007 and 2008, JBS acquired Swift & Co and Smithfield Beef Group, respectively the third- and fifth-largest Beef packers in the United States.

32.     Throughout the Class Period, the four Defendants controlled approximately 81-85% of the fed cattle slaughter market.[7] The next largest meatpacker had only a 2-3% percent market share. The Defendants chokehold on the market allowed for the conspiracy to occur, continue, and prosper.

**2.      The Meat-Packing Market Features High Barriers to Entry.**

33.     Barriers to entry are obstacles that prevent new competitors from easily entering the market. They restrict competition in a market and make it easier for those taking up the market to collude with each other, and harder for would be competitors to enter the market to undermine the cartel.

34.     The construction of a large packing plant requires an investment of at least $250 million-$350 million, and two or more years to obtain necessary permits, plan, design, and build.[8]

---

[7] Cattle Buyers Weekly Market Share of Steers and Heifers.

[8] *U.S. v. JBS* Amended Complaint, ¶41.

35.     These barriers often cause new entrants, for example Northern Beef Packers[9] and Kane Beef,[10] to file for bankruptcy shortly after attempting to enter the market. Relative insulation from the threat of new competitors enabled Defendants to maintain their unlawful agreement and supracompetitive prices without constraint.

**3.     Beef is a commodity product.**

36.     A commodity is a basic item or good used in commerce that is interchangeable with other goods of the same type. Commodities are most often used as inputs in the production of other goods or services. Markets for commodity products are conducive to collusion because competition is limited to price, as opposed to other attributes like quality or customer service.[11]

37.     Beef is a commodity. For example, beef roasts from Tyson and Cargill are virtually indistinguishable and share similar nutritional values. The USDA recognizes boxed beef as a commodity, and posts daily boxed beef prices.[12] Options and futures for fed cattle, from which boxed beef is produced, are traded on the Chicago Mercantile Exchange ("CME").

**4.     The Demand for Beef is Inelastic.**

38.     Beef demand is also relatively insensitive to price changes. According to a recent study of beef demand, "Since beef has an inelastic demand, industry total revenue increases when

---

[9]   *See*   https://www.feedstuffs.com/story-northern-beef-packers-goes-belly-up-52-100764   (last accessed June 16, 2020).

[10] *See* https://www.meatpoultry.com/articles/20783-sam-kane-beef-processors-files-forchapter-11 (last accessed June 16, 2020).

[11]       *See,        e.g.*,        https://www.investopedia.com/terms/c/commodity.asp; https://kresgeguides.bus.umich.edu/c.php?g=199860&p=1314301 (last accessed June 16, 2020). See also Dennis W. Carlton & Jeffrey M. Perloff, Modern Industrial Organization, Fourth Ed., 200 (2005) (discussing that homogenous or undifferentiated good are "viewed as identical as consumers … [and] as perfect substitutes for each other.").

[12]                                          *See,                                          e.g.*, https://www.ers.usda.gov/webdocs/publications/47486/17470_tb1911fm.pdf?v=41029; https://www.ams.usda.gov/sites/default/files/media/LMR2018ReporttoCongress.pdf.

prices rise as there comparatively is a limited reduction in volume purchased."[13] The same study concluded that chicken and pork had little impact on Beef pricing. Accordingly, when prices are increased to purchasers at a supra-competitive level, there will not be a decrease in Beef purchases, nor a switch to other proteins such as chicken or pork.

## V.    VIOLATIONS ALLEGED

39.    By the beginning of 2015 the Defendants were facing lower profitability and shrinking profit margins. Rather than acting independently to maintain profitability, Defendants agreed to collectively reduce slaughter and reduce purchases of fed cattle, which has the effect of raising prices in the purchaser market for Beef. The result were wholesale prices above a competitive level.

### A.    Defendants Agreed to Reduce Slaughter Volumes.

40.    As confirmed by Witness 1, each of the Defendants expressly agreed to periodically reduce their respective slaughter volumes, resulting in wholesale prices above competitive levels.

41.    Witness 1 is a former employee of one of the Defendants ("Defendant 1"). Witness 1 was a quality assurance officer ("QA") at one of Defendant 1's slaughter plants located within the Texas Panhandle / Western Kansas region ("Slaughter Plant 1" and "Panhandle Region", respectively) for over 10 years until his employment ceased in 2018.

42.    During the Class Period, Witness 1 acted as a head QA and had primary responsibility for the plant's kill floor, hotboxes, and coolers. The kill floor is where cattle are slaughtered and dressed, i.e., head, hide, and internal organs removed. The carcasses are then

---

[13] Glynn Tonsor, Jason Lusk, Ted Schroeder, Assessing Beef Demand Determinants, (Jan. 18, 2018) at 7-9, https://www.beefboard.org/wp-content/uploads/2019/06/Assessing-Beef-Demand-Determinants_FullReport.pdf.

moved to the hotboxes to cool down, before being stored in the coolers ahead of fabrication, where they are broken down into smaller cuts.

43.     Witness 1 learned of the Defendants' slaughter reduction "agreement" from another employee in a position to know about the unlawful "agreement" – Slaughter Plant 1's head of fabrication ("Fabrication Manager").

44.     Witness 1 reports having multiple discussions with the Fabrication Manager during which the Fabrication Manager explained that all of the Defendants agreed to reduce their purchase of fed cattle and slaughter volume. For example, during one conversation, the Fabrication manager specifically admitted that the Defendants had an "agreement" to reduce their purchase and slaughter volumes in response to what they perceived to be high fed cattle prices.

45.     Witness 1 reports that he was in the Fabrication Manager's office when the Fabrication Manager received an angry phone call from his immediate supervisor, who worked out of Defendant 1's central office.

46.     After the call concluded, Witness 1 reports that he asked the Fabrication Manager how "many are we [Slaughter Plant 1] cutting [i.e., fabricating]?" Witness 1 reports that the Fabrication Manager replied the "cut" was going to be steady that day, but that the "kills are getting cut back, [because the] price is getting too high" (or words to that effect).[14] Witness 1 then reports asking the Fabrication Manager whether other Defendants' plants were also cutting back their kill. Witness 1 reports he recalls that the Fabrication Manager answered Witness 1's question as

---

[14] Witness 1 reports that there was typically a lag between the commencement of a slaughter reduction and the reduction of fabrication activities. Among other reasons, this reflected the fact that Slaughter Plant 1's fabrication team had to continue to process the carcasses the were already hanging in the coolers. This would allow Defendant to reap the benefits of higher wholesale prices in the short term.

follows: "Yes, they are. We have had that agreement that we don't kill while prices are up for a while" (or words to that effect).

47.     Witness 1 recalls specifically that the Fabrication Manager used the word "agreement" and understood that he was referring to at least all of Defendants' plants in the Panhandle Region, namely Tyson Amarillo, Texas; JBS Cactus, Texas; Cargill Friona, Texas; and National Beef, Liberal, Kansas. Each of these plants provide a significant portion of each Defendants' fed cattle slaughter capacity (at least 20% in the case of each Packing Defendant).

48.     Witness 1 is certain that the Fabrication Manager intended to convey that all of the Defendants were reducing their slaughter volumes by agreement with their competitors in response to what they perceived as high prices for fed cattle and was not simply commenting on the fact that one or some of the Defendants had independently decided to do so.

49.     Witness 1 understands that the Fabrication Manager had first-hand knowledge of Defendants' anticompetitive agreement. The Fabrication Manager continues to work at Slaughter Plant 1, where he has worked for over 15 years in that role. In that capacity, the Fabrication Manager reported directly to Defendant 1's head office. As head of fabrication, the Fabrication Manager needed to be informed as to cattle buying, cattle slaughter, and Beef selling aspects of Defendant 1's business. He thus interacted with personnel across Defendant 1's business.

50.     Witness 1 reports that prior to working for Defendant 1, the Fabrication Manager worked at another Packing Defendant ("Defendant 2") for a number of years. Witness 1 understands that Fabrication Manager was head of fabrication for the slaughter plant operated by Defendant 2 in the Panhandle Region at which he was employed ("Slaughter Plant 2").

51.     The Fabrication Manager regularly told Witness 1 that he was in contact with his former colleagues at Slaughter Plant 2, including his replacement there. The Fabrication Manager

also told Witness 1 that he had friends and former colleagues with whom he stayed in touch at other Packing Defendant plants.

52.     The Fabrication Manager would often provide Witness 1 with detailed information as to the current and future operations of the Defendants' nearby packing plants. Witness 1 regularly stopped by the Fabrication Manager's office prior to starting his shift to learn the slaughter and fabrication numbers for that day and the upcoming days, as this affected the execution of his and his team's responsibilities. Witness 1 and the Fabrication Manager had a good working relationship.

53.     Witness 1 stated that Slaughter Plant 1 had a 5,500-6,000 head per day slaughtering capacity and might drop its kill level back to around 4,800-5,200 head per day when implementing Defendants' agreement. While Defendant 1 implemented the Defendants' agreement by buying and slaughtering fewer cattle, it also collusively reduced supply by running its slaughter plants at reduced hours, operating those plants at lower "chain speeds," and/or scheduling maintenance shutdowns.

**B.      The Agreement Resulted in Significantly Reduced Slaughter Volumes by the Defendants during the Class Period.**

54.     The impact of Tyson, JBS, Cargill, and National Beef's collusive slaughter reductions throughout the Class Period is illustrated below. The figure below compares the Defendants' and the Independent Packers' annual slaughter volumes during the Class Period and the pre-Class Period but breaks out the slaughter volumes for each year of the Class Period for which data is available. The graph confirms that Tyson, JBS, Cargill, and National Beef each slaughtered less in every year in the Class Period compared to their pre-Class Period averages. It shows that while Tyson, JBS, Cargill, and National Beef each gradually increased their slaughter

volume from 2015 onward, their rate of increase was far slower than that of the Independent Packers.



Pre- and Post-Class Period Fed Cattle Slaughter – Defendants vs. Smaller/Independents (By Year)

Source: USDA

## C.     Defendants Closed or Idled Plants, and Refrained from Expanding.

55.     In order to further the agreement to reduce slaughter and increase margins, the Defendants reached an understanding to significantly reduce slaughter capacity in the period prior to the conspiracy and into its early stages. Defendants collectively refused to expand their slaughter capacity of fed cattle once these permanent closures occurred.

- On January 17, 2013, Cargill announced that it would idle its Plainview, Texas beef processing facility on February 1, 2013.[15] This closure decreased slaughter

---

[15] *See* https://www.cargill.com/news/releases/2013/NA3070552.jsp (last accessed June 16, 2020).

capacity by 4,650 cattle per day. The Plainview, Texas plant had been one of Cargill's larger plants.[16]

- As if on cue, on February 1, 2013, a second Defendant, disclosed a reduction in live cattle processing. Tyson reported a "reduction in live cattle processed" in its Q1 2013 Form 8-K despite reporting "increased production due to sufficient cattle supply and strong demand for our beef products" for the previous quarter in its Q4 2012 Form 8-K.[17]

- Similarly, a third Defendant acquired a plant in April 2013 but announced its plan to keep the plant idle. JBS assumed ownership of a beef packing plant in Nampa, Idaho, with the capacity to process 1,100 cattle per day but had "no immediate plans to reopen the facility."[18] The plant appears to still be idle at the time of this filing.

- Around the same time, a fourth Defendant reduced its live cattle processing. National Beef shut its Brawley, California plant in June 2014.[19] This closure decreased slaughter capacity by 2,000 cattle per day.

---

[16]      *See*      http://www.angusbeefbulletin.com/extra/2013/01jan13/0113mk-cargill-plant.html#.Xuqp5EVKjb0 (last accessed June 16, 2020).

[17] Tyson Q1 2013 Form 8-K; Tyson Q4 2012 Form 8-K.

[18] *See* https://jbssa.com/about/news/2013/04-04/#.XV3HhOhKiUl (last accessed June 16, 2020).

[19]   *See*   https://www.nationalbeef.com/About/News/Pages/National-Beef-to-Close-Brawley.aspx (last accessed June 16, 2020).

- On July 30, 2014, Cargill then announced that it would close its Milwaukee, Wisconsin plant on August 1, 2014. This closure decreased slaughter capacity by 1,300 to 1,400 cattle per day.[20]

- In the first and second quarters of 2015, JBS closed six beef processing plants.[21] On September 11, 2015, Cargill announced that it would sell the aforementioned Plainview, Texas plant that was idled in February 2013.[22]

- To match these closures, Tyson posted a "reduction in live cattle processed" for each of the eight quarters from Q2 2014 to Q1 2016, as reported in its Form 8-K for the same period.[23] This was in spite of Tyson reporting "historically high wholesale beef prices[,]" "[l]ow production volumes relative to demand[,]" and "adequate supplies for [its] beef operations as [its] plants are located close to the fed cattle supplies" in its Q1 2014 8-K.[24]

- Additionally, Tyson closed its Denison, Iowa plant in August 2015.[25] This closure decreased slaughter capacity by 2,000 cattle per day.

---

[20] See https://www.cargill.com/news/releases/2014/NA31669068.jsp (last accessed June 16, 2020).

[21] JBS August 14, 2015 Q2 Earnings Call.

[22] *See* https://www.cargill.com/news/releases/2015/NA31890857.jsp (last accessed June 16, 2020).

[23] Tyson Q2 2014 Form 8-K; Tyson Q4 2014 Form 8-K; Tyson Q5 2014 Form 8-K; Tyson Q1 2015 Form 8-K; Tyson Q2 2015 Form 8-K; Tyson Q3 2015 Form 8-K; Tyson Q4 2015 Form 8-K; Tyson Q1 2016 Form 8-K.

[24] Tyson January 31, 2014 Q1 Earnings Call.

[25] *See* https://siouxcityjournal.com/news/no-9-tyson-closes-dension-beef-plant/article_721502af-f0dc-5e91-82a3-151434df0184.html#:~:text=9%20story%20of%202015.&text=DENISON%2C%20Iowa%20%7C%20Tyson%20Fresh%20Meats,Inc.%20is%20the%20Journal's%20No. (last accessed June 16, 2020).

56.     The Defendants took other actions to restrict supply in the months leading up to and during the Class Period. For example, Tyson closed a Cherokee, Iowa processing plant in 2014. According to media reports, Tyson officials "told the city they would consider handing over the shuttered plant – but not to any firm that they believe is competition."[26] In 2018, four years after the initial closure, Tyson allowed another company to purchase the plant, but only after inserting a requirement into the deed that "limit[ed] the amount of cattle that can be processed at the plant for the next 10 years."[27]

57.     Collectively, these closures reduced the industry's annual slaughter capacity by millions of cattle per year. Defendants' plant closures, even excluding the continued idling of the Nampa plant, stripped out approximately two million head from the industry's annual slaughter capacity. Defendant offered pre-textual explanations, such as a lack of available cattle in the adjacent regions and plant inefficiencies regarding each closure.[28]

58.     As a result, the United States experienced both declining fed cattle slaughter capacity and underutilization of that capacity. The utilization rates fell from 92% in 2010-2014 to 84% in 2015.

---

[26] *Available at* https://www.desmoinesregister.com/story/money/business/ 2016/07/08/held-hostage-tyson-iowa-towns-dilemma/86449400/.

[27]   Available at https://www.desmoinesregister.com/story/money/business/2018/09/19/tyson-foods-cherokee-iowa-plant-iowa-food-group-moves-justin-robinsonpork-beef-chicken-processing/1356962002/.

[28] National Beef even rejected a significant package of incentives offered by local government, utilities and nearby feedlots when it decided to close its Brawley plant. "National Beef plant closing Brawley Facility," PROGRESSIVE CATTLEMEN (Mar. 24, 2014), https://www.progressivecattle.com/news/industry-news/national-beef-plant-closing-brawley-facility.

**D.    Defendants Publicly Signaled Each Other to Keep Slaughter and Capacity Restrained.**

59.    One of the methods by which the Defendants were able to coordinate and monitor their collusive efforts to reduce supply was through earnings call statements:

- During a March 2013 Q4 Earnings Call, JBS affirmed that it would not increase capacity: "Yeah, so about beef in US like I mentioned and like you mentioned here in the call, we expect and we believe the market will improve in some way from the second quarter on. We are not adding capacity. So we will not increase or improve our capacity utilization in US because we need to balance in our business supply and demand. So everybody knows that the US herd is shrinking and there is less cattle available. So we are not going to increase capacity or to run our plants with better capacity utilization. Actually the other way around, we are also reducing in some extend, reduce some hours to balance better the market and to try to improve margin in our business."[29]

- During a January 2014 Q1 Earnings Call, Tyson's COO stated that National Beef's decision to close its Brawley, California plant "is consistent, I guess, with what we've been saying all along, as the calf crop declines and the noncompetitive feedlot areas or noncompetitive plants or the combination thereof, we'll probably have to curtail production . . . to some extent, we've always felt that—and anticipated something like that would happen."[30]

---

[29] JBS March 14, 2013 2012 Q4 Earnings Call.

[30] Tyson January 31, 2014 Q1 Earnings Call.

- 21 -

- During a May 2014 Earnings Call, JB forecasted for the industry: "For 2015, I think beef will keep being tight. I don't see any increase in beef supply in 2015 in U.S."[31]

- During an August 22, 2014 Q2 Earnings Call, JBS's Global CEO Wesley Mendonça Batista noted, "In the last 12 months or more, year-and-a-half, we saw five plants that [shut down in the U.S.], and [that definitely] is going to help to balance the supply and the industry capacity to be much more balanced, and we are optimistic that we are going to see good improvement on the beef business." He further stated, "[A] couple of things that we are more optimistic about the beef business in U.S. First of all is, of course, the industry adjusting capacity is a key factor. Five plants closed in the last year-and-a-half, so this looks almost 8,000 [head] per day out of the market, so for sure this is a key factor to help balance the industry to have a better margin and a better results. . . . in our view, the worst period on the beef business is behind."[32]

- The following quarter, JBS's Mr. Batista suggested in a November 2014 Q3 Earnings Call that his company's recent acquisition of XL Foods' Omaha, Nebraska plant was probably a mistake, and that slaughter capacity must be reduced in California and at least one other U.S. region ("If you want to be balanced you need to have capacity to be shut there.").[33]

---

[31] JBS May 15, 2014 Q1 Earnings Call.

[32] JBS August 22, 2014 Q2 Earnings Call.

[33] JBS November 13, 2014 Q3 Earnings Call.

- During a November 2014 Q4 Earnings Call, Tyson projected for the industry, "So as you know with really high beef prices, beef volume is down. . . . [W]e already know that the beef supply, the beef herds are going to be down another 4%, which portends pretty high beef prices again into the future."[34]

- During Tyson's 2014 Investor Day, it indicated that high beef prices would be the norm: "Now, if you look at elevated beef prices, coming in to this year, beef supply will be down about 5% or so versus last year. Next year, because we already see the calf crop, we know that next year's beef supply will be down another 4% or so. So, elevated beef prices are here to stay for a while. It would take us several years, maybe out to 2020 to be able to grow the supply of cattle back to FY 2013 number. So we're going to have high beef prices for a while…"[35]

- Further, Tyson stated it was managing its margin: "By rationing that [fed cattle] supply, by lowering that volume coming into the market, we're able to generate that margin spread. And that's not going to change anytime soon. As we continue on in these tightened supply periods, we're going to continue to manage margin. And our expectation as we roll into next years, we're going to see similar type earnings as what we've seen."

- During a May 2014 Q4 Earnings Call, Tyson conveyed that it was striving for margin and not market share: "For fiscal 2015, we expect fed cattle supply to be down 5% to 6% from last year. And we think we've experienced the bottom

---

[34] Tyson November 17, 2014 Q4 Earnings Call.

[35] Tyson December 10, 2014 Investor Day Transcript.

of the beef supply cycle. After this year, we believe we'll see slow incremental improvement in supply. Our Beef segment results should improve in the back half of the year, and while profitable for the year, fiscal 2015 results are expected to be below fiscal 2014. It is important to remember that we'll continue to run our Beef business for margin not market share."[36]

- In August 2015, Tyson's then-CEO Donald Smith publicly stressed the need for further slaughter reductions during the company's Q3 Earnings Call: "[b]ecause we run for margin and not for market share, we're not willing to overpay for cattle and we've had to cut back on our hours at our plants resulting in inefficiencies and added costs. In the short-term, we are negatively impacted, but markets will equilibrate, and conditions are expected to improve for the long term." He also admitted that "industry capacity utilization [was] probably in the low 70s."[37] The next quarter, Mr. Smith acknowledged that "excess industry capacity … limits [Tyson's] ability to drive margins above [] 1.5% to 3%, we think."[38]

- In August 2015, in response to a question regarding "beef capacity"— specifically, competitors "talking about how many plants they closed during the quarter et cetera . . . it looks like an industry-wide move[,]"—JBS's Mr. Batista remarked that JBS "closed six plants in these two quarters . . . we are the leader in this market and we closed this plant as well . . . for me it's clear that now the

---

[36] Tyson May 4, 2014 Q4 Earnings Call.

[37] Tyson August 3, 2015 Q3 Earnings Call.

[38] Tyson November 24, 2015 Q4 Earnings Call.

industry is balanced in terms of cattle availability and also demand. And for me it's clear that the industry is not going to put back any plants until the industry see a sustainable demand recovery and as well cattle availability."[39]

- JBS's André Nogueira de Souza publicly praised the Defendants' efforts to reduce industry-wide slaughter capacity through plant closures on its November 12, 2015, Q3 Earnings Call, noting "the reduction that we saw in the capacity of production in U.S. [] with the shutdown of 90 plants the last two years reduce the cattle – the capability of U.S. to process 3.5 million" and that it had left the industry in "a very good position, [to achieve] balance in the industry in 2016, 2017, and 2018."[40]

- On a May 2016 Q1 Earnings Call, JBS's Mr. Nogueira de Souza remarked, "So I don't see any imbalance in this near future, even cattle is coming back and we're going to see a little bit more production of beef this year and next year. It's still way, way below how it was few years ago and we'll be balancing at this side because a lot of plant was shut but it's too way below our historical production level."[41]

As demonstrated, Defendants often discussed the industry cuts as a whole on these earnings calls.

---

[39] JBS August 14, 2015 Q2 Earnings Call.

[40] JBS November 12, 2015 Q3 Earnings Call.

[41] JBS May 12, 2016 Q1 Earnings Call.

**E.     The Collusive Agreement to Reduce Resulted in an Increased Spread Between the Fed Cattle and Beef Prices.**

60.     Between 2009 and 2014 fed cattle prices steadily increased due to a natural shortage following droughts from 2011 through 2013, and wholesale prices of Beef moved in tandem. As a result, the Defendants' profits were slim with margins at between 1% and 3%.

61.     Prior to 2015, the prices of cattle and Beef generally moved in tandem with a reasonably constant relationship (or margin) between them. As the DOJ has recognized, when the Beef market is functioning competitively, there is a strong relationship between the supply of cattle and the price being charged to purchasers:

> [A]ll else being equal, when the meat packing industry reduces production levels, feedlots and cattle producers are paid less for fed cattle because fewer fed cattle are demanded and customers pay more for [beef] because less is available for purchase. Because the supply of fed cattle and demand for [beef] are relatively insensitive to short-term changes in price, even small changes in industry production levels can significantly affect packer profits.[42]

62.     In a competitive market, lower cattle prices would lead to correspondingly lower wholesale Beef prices. But once the conspiracy was initiated, the spread between cattle and Beef prices diverged significantly. The Defendants' agreement to act in concert successfully altered the relationship between cattle and Beef prices, and purchasers were overcharged for Beef.

63.     Beginning in 2015, the "spread" between fed cattle and boxed beef wholesale prices began to diverge, with the spread increasing dramatically throughout the class period:

---

[42] Amended Complaint, ¶ 26-27, *U.S. v. JBS SA* (N.D. Ill., Eastern Division) (08-cv-05992), filed on November 7, 2008.



64.     According to data from the USDA Economic Research Service, the average spread between the average farm value of cattle and wholesale value of beef was substantially higher from January 2015 to the present than it was in the preceding 5 years.

**F.      Tyson and JBS Attribute Their Record 2017 & 2018 Profits to "Visibility" into the Beef Supply Chain.**

65.     Tyson and JBS continued to report elevated profit margins throughout 2017 and 2018. On earnings conference calls during this period, executives from JBS and Tyson frequently attributed record profits to their ability to understand the amount of cattle in the Beef supply chain in upcoming years. JBS executives also noted that they were not taking market share from competitors, and that elevated margins had been boosted by the capacity decreases following plant closures.

66.     On August 7, 2017, Tyson reported a beef business operating margin of 3.7 percent for the third quarter and emphasized its confidence in the beef business going forward: "With ample supplies of cattle, we see very good conditions for our Beef business as far out as 2020, as we enter the early stages of a multiyear expansion cycle. Absent a shock to the system such as a

drought or an import ban, our Beef business is well-positioned for profitable, long-term growth."[43] Tyson acknowledged that it was considering raising its previously-forecasted 1.5 to 3 percent normalized operating margins. But, despite "ample" supply of cattle and high demand for beef, the Defendants did not increase cattle purchases or cattle slaughter.

67.     On February 8, 2018, Tyson reported quarterly operating beef margins of 6.6 percent and yearly beef margins close to 6 percent and emphasized that it had "pretty good visibility into '19 and '20 at this point." "We see the number of animals out there," executives said. Tyson further stated that "we have…good visibility into the cattle that's out there. We see the number of animal so that's that certainly good for us."[44]

68.     On May 7, 2018, Tyson announced forecasted beef operating margins of 6 percent for the year—at least twice its normalized operating margin range of 1.5 to 3 percent. Tyson claimed the huge jump was attributable to "those cattle on feed reports and knowing that the supplies in our region are exceptionally good."[45]

69.     Likewise, on May 15, 2018, JBS reported an EBITDA margin of 6.1 percent for the quarter and forecasted that the company would enjoy record beef margins for the next two quarters. JBS emphasized that its performance was not based on "taking share from anyone."[46]

70.     On August 6, 2018, Tyson reported a beef operating margin of 8 percent for the quarter. Tyson stated that it had an "optimistic outlook" because "we have good visibility into 2021…that's good because we do see the number of animals that are out there."[47]

---

[43] Tyson August 7, 2017 Q3 Earnings Call.

[44] Tyson February 8, 2018 Q1 Earnings Call.

[45] Tyson May 7, 2018, Q2 Earnings Call.

[46] JBS May 15, 2018 Q1 Earnings Call.

[47] Tyson August 6, 2018 Q3 Earnings Call.

71.     On August 15, 2018, JBS reported a beef EBITDA margin of 10.2 percent for the quarter and stated that it was "moving the overall margin in beef… [to] a different level that was in the past." JBS went on to say that it benefitted from shutting several plants in the previous five years, and that it could not see how U.S. beef could "be less profitable in 2019 compared to … 2018."[48]

72.     On November 13, 2018, Tyson reported record beef operating margins of 8.9 percent for the quarter and 6.7 percent for the year, and stated that it expected similar results in the following years thanks to visibility into cattle supply: "As we look at 2019, 2020, even in 2021 we frankly we don't see a lot of change. The supply appears to be relatively stable. We have a good sense of what that looks like just due to the calf crop that gives us good visibility for at least a couple of years."[49]

## VI.     ADDITIONAL FACTORS SUPPORTING THE EXISTENCE OF DEFENDANTS' CONSPIRACY

### A.     Defendants Took Advantage of Numerous Opportunities to Collude.

73.     Defendants are members of industry trade associations and forums and regularly attend industry events, including those listed below. These events provided ample opportunity to facilitate conspiratorial conduct through in person communication.

74.     For example, the National Cattlemen's Beef Association ("NCBA") holds an annual convention (known as "CattleCon"), a summer conference, a legislative conference, and regional meetings.[50] The NCBA Product Council, which includes representatives of the

---

[48] JBS August 15, 2018 Q2 Earnings Call.

[49] Tyson November 23, 2018 Q4 Earnings Call.

[50] *See* https://www.ncba.org/CMDocs/BeefUSA/AboutUs/2019NCBA%20 Allied%20Industry%20Brochure.pdf (last accessed June 16, 2020).

Defendants, meets quarterly for the invitation-only Beef Executive Forum.[51] The Defendants also participate in meetings of the Beef Checkoff program run by the Federal of State Beef Councils, which are held contemporaneously with the NCBA summer and winter meetings.[52]

75.    The U.S. Meat Export Federation ("USMEF")—a trade association that develops export opportunities for U.S. protein producers and whose leadership includes current and former employees and officers of Defendants—also holds both spring and fall conferences and monthly international trade shows.[53]

76.    The Defendants were among the founding members of the Global and U.S. Roundtables for Sustainable Beef ("USRSB") and continue as members today.[54] The Defendants participate in USRSB annual meetings each spring, and JBS and Cargill have leadership positions in certain working groups.

77.    Defendants also came together for numerous meetings, conferences, conventions, and expositions sponsored by the North American Meat Institute ("NAMI") and its predecessor, the American Meat Institute ("AMI"). The Defendants each maintained membership in AMI / NAMI throughout the Class Period[55] and served on the AMI and NAMI Board of Directors.

78.    The industry's "Annual Meat Conference," described on its website as "a complete education and networking experience," provides another opportunity for the Defendants to connect

---

[51] *See* https://www.ncba.org/productcouncilmembers.aspx (last accessed June 16, 2020).

[52] *See* https://www.ncba.org/federation.aspx (last accessed June 16, 2020).

[53] *See* http://www.usmef.org/about-usmef/membership/usmef-members/ (last accessed June 16, 2020).

[54] *See* https://www.usrsb.org/processors.aspx (last accessed June 16, 2020 via waybackmachine.com).

[55] *See* https://www.meatinstitute.org/index.php?ht=d/sp/i/2343/pid/2343 (last accessed June 16, 2020).

and communicate. Many of the Defendants' high-level executives have been attending this conference for years: the list of registered attendees in 2012 included eight executives from JBS USA; then-CEO of Tyson Foods Donnie Smith and twelve other Tyson executives.

79.     NAMI also sponsors an annual "Meat Industry Management Conference," which NAMI promoted as focusing on topics including "economics," "general business," and an "always popular Answers Actions session."

80.     In April 2017, NAMI replaced the Annual Meeting and Outlook Conference and the Meat Industry Management Conference with an annual "Meat Industry Summit." That summit included "networking opportunities and social events" including a golf tournament, receptions, an Issues, Answers, Actions Breakfast, the annual Board of Directors meeting, and what one publication described as "closed door committee meetings to discuss policies and association business." The 2017 Summit included a presentation by John Nalivka of Sterling Marketing entitled "Economic Outlook for the Red Meat Industry," described as an "analysis of supply and demand and price forecasts" to "cover all aspects of the supply chain, and help your business prepare for the years ahead."

81.     Defendants' CEOs and top-level executives attend many of these meetings and events each year. As a result, they regularly have the opportunity to discuss pricing, production, and other proprietary information in an informal setting, and confirm that competitors remain committed to artificially restricting Beef supply.

**B.      The Defendants Supply Restraints Were Not Offset and Were Further Exacerbated by Reductions in Imports.**

82.     The Defendants did not offset their slaughter reductions by importing more cattle. The below chart shows that starting in 2015, there was a significant decrease in imports. This downward trend continued throughout the class period as evidence by this chart:



Source: ERS calculations using data from U.S. Department of Commerce, Bureau of the Census.

83. The decrease in domestic slaughter, combined with the decrease in imported fed cattle for slaughter, resulted in prices to Plaintiff and Class Members above a competitive level.

**C.   Overcharges due to the cartel were passed through to the indirect purchaser class.**

84. As a matter of economic principle, firms must recover the short-run variable costs of production when they price their products for the market, which ultimately get passed to commercial and institutional indirect purchasers in the form of higher prices. For a firm to be profitable, the firm must recover its marginal cost of production. In a perfectly competitive market, firms price at marginal cost and when marginal costs increase, the cost increases are passed through to the commercial and institutional indirect purchasers 1:1 or at a 100 percent pass-through rate. As a general matter, the pass-through rate will be determined by the relative elasticities of supply and demand. When demand is inelastic (as it is for beef) the pass-through rate is closer to 100 percent.

**D.     The Defendants actively concealed the conspiracy.**

85.     Throughout the Class Period, the Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from plaintiff and class members.

86.     The combination and conspiracy alleged herein was fraudulently concealed by the Defendants by various means and methods, including, but not limited to (i) communicating with each other by telephone about their purchases and slaughter volumes so that they would not have written evidence of sharing this information with a competitor, as well as relying on non-public forms of communication; (ii) offering false or pretextual reasons for low fed cattle prices; (iii) offering pretextual justifications for their plant closures, slaughter reductions, and withdrawal from the cash cattle trade; (iv) affirmatively misrepresenting that they complied with applicable laws and regulations, including antitrust laws; and (v) misrepresenting the nature of their agreements (and purported adherence to competitive safeguards) to government officials and to the public.

87.     The Defendants offered pretextual justifications for plant closures, slaughter reductions, and withdrawal from the cash cattle trade.  The Defendants also offered pretextual reasons for low fed cattle prices. Just some, but by no means all, examples are as follows:

88.     In furtherance of the conspiracy, Tyson repeatedly issued pretextual public statements to conceal Defendants' conspiracy. For example, in their SEC filings between 2015 and 2018, Tyson stated that it had "limited or no control" over the production and pricing of cattle, rather, the price is "determined by constantly changing market forces of supply and demand." [56] According to Tyson, factors that affect the cost of cattle include "weather patterns throughout the

---

[56] Tyson Foods, Inc., Annual Report (Form 10-K) at 7 (Oct. 3, 2015); Tyson Foods, Inc., Annual Report (Form 10-K) at 7 (Oct. 1, 2016); Tyson Foods, Inc., Annual Report (Form 10-K) at 6 (Sept. 30, 2017); Tyson Foods, Inc., Annual Report (Form 10-K), at 7-8 (Sept. 29, 2018).

world, outbreaks of disease, the global level of supply inventories and demand for grains and other feed ingredients, as well as agricultural and energy policies of domestic and foreign governments."[57] Additionally, Tyson stated that it "ceased operations at our Denison, Iowa plant" in order to "better align our overall production capacity with current cattle supplies."[58] Furthermore, Tyson stated, "[t]he Beef segment earnings improved . . . due to more favorable market conditions associated with an increase in cattle supply which resulted in lower fed cattle costs."[59]

89.     Tyson made these pretextual public statements in order to conceal its participation in the conspiracy. Rather than disclose that their improved earnings were in fact the supracompetitive profits of Defendants' unlawful conspiracy, Tyson instead offered the innocuous pretexts of "lower fed cattle costs" and "favorable market conditions."[60]

90.     In furtherance of the conspiracy, JBS repeatedly issued pretextual public statements to conceal Defendants' conspiracy. For example, in November 2015, JBS executive, Andre Nogueira, stated that "Cattle price will go down" in the United States because "we are going to

---

[57]   Tyson Foods, Inc., Annual Report (Form 10-K) at 7 (Oct. 3, 2015); Tyson Foods, Inc., Annual Report (Form 10-K), at 7 (Oct. 1, 2016); Tyson Foods, Inc., Annual Report (Form 10-K) at 6 (Sept. 30, 2017); Tyson Foods, Inc., Annual Report (Form 10-K), at 7-8 (Sept. 29, 2018).

[58]   Tyson Foods, Inc., Annual Report (Form 10-K), at 56 (Oct. 3, 2015); Tyson Foods, Inc., Annual Report (Form 10-K), at 54, 68 (Oct. 1, 2016); Tyson Foods, Inc., Annual Report (Form 10-K), at 57, 72 (Sept. 30, 2017).

[59]   Tyson Foods, Inc., Annual Report (Form 10-K) at 23 (Oct. 1, 2016); *see also* Tyson Foods, Inc., Annual Report (Form 10-K), at 23 (Sept. 30, 2017) ("The Beef segment experienced strong export demand and more favorable domestic market conditions associated with an increase in cattle supply."); Tyson Foods, Inc., Annual Report (Form 10-K), at 25 (Sept. 29, 2018) (same).

[60]   Tyson Foods, Inc., Annual Report (Form 10-K) at 23 (Oct. 1, 2016); *see also* Tyson Foods, Inc., Annual Report (Form 10-K) at 23 (Sept. 30, 2017) ("The Beef segment experienced strong export demand and more favorable domestic market conditions associated with an increase in cattle supply."); Tyson Foods, Inc., Annual Report (Form 10-K) at 25 (Sept. 29, 2018) (same).

see more cattle available."[61] In March 2016, JBS CEO, Wesley Mendonca Batista, similarly stated that JBS would enjoy "better margin[s]" because of an "increase in the herd in the U.S."[62] Similar statements continued throughout 2016 and into 2017 and 2018, with JBS executives repeatedly stating that its strong financial performance in the United States was due to "more cattle available in the U.S.,"[63] "cattle price[s] . . . [being] back to the normal level,"[64] "greater cattle availability,"[65] and "strong demand for beef."[66]

91.     JBS made these pretextual public statements in order to conceal its participation in the conspiracy. Rather than disclose that the "improvement in EBITDA margin"[67] JBS in fact, reflected the supracompetitive profits of Defendants' unlawful conspiracy, it instead offered the innocuous pretexts of "greater cattle availability" and cattle prices mysteriously being "back to the normal level."

92.     In furtherance of the conspiracy, Cargill repeatedly issued pretextual public statements to conceal Defendants' conspiracy. For example, in May 2018, Cargill reported that "excellent results in North American beef" led the company's Animal Nutrition & Protein segment to deliver the largest share of corporate earnings on the year. Cargill concealed the true reason for its "excellent results," instead attributing them simply to "lower cattle costs and rising demand in

---

[61] JBS, Q3 2015 Earnings Call, Transcript (Nov. 12, 2015).

[62] JBS, Q4 2015 Earnings Call, Transcript (Mar. 17, 2016).

[63] JBS, Q2 2016 Earnings Call, Transcript (Aug. 11, 2016).

[64] JBS, Q3 2016 Earnings Call, Transcript (Nov. 16, 2016).

[65] JBS, Q1 2017 Earnings Call, Transcript (May 16, 2017).

[66] JBS, Q2 2018 Earnings Call, Transcript (Aug. 15, 2018).

[67] *Id*.

both domestic and export markets."[68] Similarly, in its 2017 Annual Report, Cargill reported that "favorable market conditions in North America" were simply the product of "[r]enewed . . . demand for beef . . . "[69] In 2018, Cargill announced that its Animal Nutrition & Protein business surpassed even the prior year's "strong performance," "fueled by rising domestic and export demand for North American beef . . . "[70]

93.     Cargill made these pretextual public statements in order to conceal its participation in the conspiracy. Rather than disclose that its "excellent results" were in fact the supracompetitive profits of Defendants' unlawful conspiracy, Cargill instead offered the innocuous pretexts of "lower cattle costs" and "rising demand."

94.     In furtherance of the conspiracy, National Beef repeatedly issued pretextual public statements to conceal Defendants' conspiracy. On information and belief, National Beef was the original and knowing source of every pretextual public statement ostensibly made by Jefferies Financial Group[71] and Marfrig Global Foods S.A.[72] to conceal Defendants' conspiracy. For example, in October 2015, Jefferies Financial Group stated that the expected expansion of the cow-

---

[68] Cargill, Inc. Management's Discussion and Analysis of Financial Condition and Results of Operations for the three months and year ended May 31, 2018, Municipal Secondary Market Disclosure Filing Sheet, at 2 (Aug. 14, 2018).

[69] Cargill, Inc., 2017 Annual Report at 1, https://www.cargill.com/doc/1432094802973/2017-annual-report.pdf.

[70] Cargill, Inc., 2018 Annual Report at 3, https://www.cargill.com/doc/1432124831909/2018-annual-report.pdf.

[71] National Beef's controlling shareholder prior to June 2018. Jefferies Financial Group Inc., Annual Report, (Form 10-K) at 6 (Jan. 10, 2019) ("Jefferies 2018 Annual Report"). After the acquisition, Jefferies Financial Group, retained a 31% interest in National Beef.

[72] A Brazilian meatpacking conglomerate with operations around the world. Since June 2018, Marfrig owns a controlling interest in National Beef Packing Company, LLC. *Marfrig Concludes Acquisition of National Beef*, Marfrig (Jun. 6, 2018), http://www.marfrig.com.br/en/documentos?id=780.

herd "bodes well for [packing industry] margins as it will lead to an increase in the number of fed cattle available for slaughter."[73] Jefferies Financial Group throughout 2017 and 2018, noted, for example, that: "National Beef generated record results for [Last Twelve Months] on the back of a more balanced supply of cattle and robust end market demand";[74] "an increased supply of cattle in 2017 has driven higher margins and greater capacity utilization versus 2016";[75] "pre-tax income grew by $78.3 million, as increased cattle availability and strong demand for beef continued to support strong margins";[76] and "because the peak in supply of fed cattle ready for slaughter lags the peak size of the beef cowherd, throughput should continue to increase for at least the next several years, supporting continued above-average packer margins."[77] National Beef's CEO and President, Tim Klein, attended the Jefferies Financial Group Investor Day presentations in 2015, 2016, and 2017 at which the above statements were made.[78] Mr. Klein was the designated speaker for the portion of these events directed to National Beef's performance.

---

[73] Leucadia National Corporation (Jefferies Financial Group), 2015 Investor Day Presentation at 118 (Oct. 8, 2015).

[74] Leucadia National Corporation (Jefferies Financial Group), 2017 Investor Meeting at 1 (Oct. 5, 2017).

[75] *Id*. at 58.

[76] Jefferies Financial Group Inc., 2017 Annual Report (Form 10-K) at 33 (Feb. 28, 2018).

[77] Jefferies Financial Group Inc, 2018 Investor Meeting at 61 (Oct. 4, 2018). National Beef director, and Jefferies Capital Partners Managing Director, Nick Daraviras, presented in relation to National Beef at this event, further noting that "favorable supply and demand dynamics continue, leading to an enhanced margin environment industry-wide".

[78] Press Release, *Leucadia to Host Investor Day on October 8, 2015*, Leucadia National Corporation (Jefferies Financial Group) (Sept. 1, 2015), http://www.leucadia.com/All/1/1113; Press Release, *Leucadia to Host Investor Day on October 5, 2016*, Leucadia National Corporation (Jefferies Financial Group) (Sep. 12, 2015), http://www.leucadia.com/All/1/1113; Press Release, *Leucadia to Host Investor Day on October 5, 2017*, Leucadia National Corporation (Jefferies Financial Group) (Sept. 13, 2017), http://www.leucadia.com/All/1/1113.

95.     Marfrig Global Foods S.A. continued to offer similar pretextual explanations for the low prices caused by Defendants' anticompetitive agreement after it bought a controlling stake in National Beef. For example, in November 2018, Marfrig reported that "[i]n the United States, the cattle availability combined with stronger domestic and international demand has been supporting better margins."[79] Marfrig executives reiterated the point on the company's earnings call for the third quarter of 2018, stating that "the U.S. beef industry has delivered record results" thanks to "an ample supply of cattle" and "strong demands [sic] in both the domestic and international markets."[80] Marfrig acknowledged that it achieved these "record results" and "better margins" while reducing cattle slaughter volumes—but the company claimed that its reduced slaughter volumes were merely the result of there being "fewer weeks in the third quarter 2018 compared to the third quarter 2017."[81] National Beef CEO, Tim M. Klein—referred to as "CEO of [Marfrig's] North American Operations" by Marfrig CEO, Eduardo de Oliveira Miron—participated in this call.[82] Similarly, in the fourth quarter of 2018, Marfrig announced that it achieved a "[s]olid result from North America Operation, sustained by strong demand for beef protein and the higher cattle availability."[83]

96.     Jefferies and Marfrig made these pretextual public statements on behalf of National Beef in order to conceal its participation in the conspiracy. Rather than disclose that its "record results" and "better margins" in fact reflected the supracompetitive profits of Defendants' unlawful

---

[79] Marfrig Global Foods S.A., Earnings Release 3Q18 (Nov. 5, 2018) at 2.

[80] Marfrig, Q3 2018 Earnings Call, Transcript (Nov. 6, 2018) at 5.

[81] *Id*. at 3.

[82] *Id*. at 2.

[83] Marfrig Global Foods, Earnings Conference Call 4Q18 and 2018 Presentation (Feb. 28, 2018) at 8.

conspiracy, Jefferies and Marfrig echoed the innocuous pretexts offered up by the Tyson, JBS, and Cargill Defendants—suggesting, falsely, that "ample supply of cattle," "higher cattle availability," and "strong demand" were responsible for its supracompetitive profits.

97.     The Defendants' conspiracy was inherently self-concealing because it relied on secrecy for its successful operation. Had the public learned that Defendants conspired to lower supply and effectively fix prices, their conspiracy could not have continued for as long as it did.

98.     Although the federal government recently was asked to review factors affecting pricing in the U.S. cattle market, the Government Accountability Office (GAO) had limited investigative authority in producing its April 2018 report, and "did not obtain and review internal packer documents."[84] The GAO's analysis explicitly "did not include a review of whether packers engaged in anticompetitive behavior" of the type complained herein.[85]

99.     Because of Defendants' fraudulent concealment, Plaintiff and the Class had insufficient information concerning Defendants' misconduct on which to base a complaint, and could not have discovered it through the exercise of due diligence until recently. Plaintiff has acted diligently in seeking to bring their claims promptly.

100.    Accordingly, by virtue of the fraudulent concealment of their wrongful conduct by the Defendants and all of their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that plaintiff and the other class members have as a result of the unlawful combination and conspiracy alleged in this complaint.

---

[84] U.S. Gov't Accountability Off., GAO-18-296, *U.S. Dep't of Agriculture: Additional Data Analysis Could Enhance Monitoring of U.S. Cattle Market* 16 (Apr. 2018), https://www.gao.gov/assets/700/691178.pdf at 28-29.

[85] *Id.*

**E.      The Defendants' conspiracy continues through the present.**

101.    As alleged herein, the Defendants' price-fixing conspiracy lasted from at least January 1, 2015 and continues through the present.

102.    Tyson, JBS, Cargill, and National Beef each engaged in the conspiracy to fix and suppress the price of fed cattle in the United States.

103.    As a result of the anticompetitive conduct challenged in this Complaint, throughout the Class Period, the Defendants were able to and did purchase cattle at artificially suppressed cash prices and purchase cattle at artificially suppressed prices pursuant to formula, forward, and/or grid contracts throughout the Class Period.

104.    Each Defendant's purchase for fed cattle at artificial and non-competitive price constituted a new overt act causing injury to the proposed Classes.

105.    The Defendants' purchases pursuant to the conspiracy continued throughout the Class Period and, accordingly members of the proposed Class were injured and may recover for damages suffered at any point in the conspiracy.

106.    The Defendants continue to engage in the anticompetitive conduct alleged herein, and continue to be able to and do purchase cattle at artificially suppressed cash prices and purchase cattle at artificially suppressed prices pursuant to formula, forward, and/or grid contracts throughout the Class Period.

107.    The Defendants' unlawful communications regarding pricing and procurement decisions continue to this day.

# VII.   CLASS ACTION ALLEGATIONS

108.   Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All commercial and institutional purchasers in the United States and its territories that purchased beef, once or more, other than directly from Defendants, entities owned or controlled by Defendants, or other producers of beef, from January 1, 2015 to present. Excluded from the Nationwide Class are the Court and its personnel, and any Defendants and their parent or subsidiary companies.

109.   Plaintiff also brings this action on behalf of itself and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states and territories listed below (the "Indirect Purchaser States")[86] on behalf of the following class (the "Damages Class"):

> All commercial and institutional purchasers in the Indirect Purchaser States that purchased beef, once or more, other than directly from Defendants, entities owned or controlled by Defendants, or other producers of beef from January 1, 2015 to present. Excluded from the Damages Class are the Court and its personnel, and any Defendants and their parent or subsidiary companies.

110.   The Nationwide Class and the Damages Class are referred to herein as the "Classes." Plaintiff reserves the right to modify the class definitions at a later date. While Plaintiff

---

[86] The Indirect Purchaser States include the following states (and territory):  Arizona, Arkansas, California, District of Columbia, Florida, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

does not know the exact number of the members of the Classes, there are likely thousands of class members.

111.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of beef in the United States;

(b)    Whether Defendants and their co-conspirators participated in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements that they reached;

(c)    The identity of the participants of the alleged conspiracy;

(d)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(e)    Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

(f)    Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

(g)    Whether Defendants unjustly enriched themselves to the detriment of the Plaintiff and the members of the Classes, thereby entitling Plaintiff and the

members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

(h)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Classes;

(i)     The effect of the alleged conspiracy on the prices of beef sold in the United States during the Class Period;

(j)     Whether the Defendants and their co-conspirators actively concealed, suppressed, and failed to disclose material facts to Plaintiff and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for beef, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiff and the other members of the Classes;

(k)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(l)     The appropriate class-wide measure of damages for the Damages Class.

112.    Plaintiff's claims are typical of the claims of the members of the Classes. Plaintiff and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for beef purchased indirectly. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

113.    Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

114.   The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

115.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Plaintiff reserves the discretion to certify the Damages Class as separate classes for each of the Indirect Purchaser States or as separate classes for certain groups of Indirect Purchaser States, should the Court's subsequent decisions in this case render that approach more efficient.

116.   The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VIII.  ANTITRUST INJURY

117.   Defendants' anticompetitive conduct had the following effects, among others:

A.   Price competition has been restrained or eliminated with respect to beef;

B.   The prices of beef have been fixed, raised, stabilized, or maintained at artificially inflated levels;

- 44 -

C.   Commercial and institutional indirect purchasers of beef have been deprived of free and open competition; and

D.   Commercial and institutional indirect purchasers of beef, including plaintiff, paid artificially inflated prices.

118.   Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge paid by the commercial and institutional indirect purchasers. Thus, the economic harm to plaintiff and the class members can be quantified.

119.   The purpose of the conspiratorial conduct of defendants and their co-conspirators was to raise, fix, or maintain the price of beef and, as a direct and foreseeable result, plaintiff and the Class paid supra-competitive prices for beef during the Class Period.

120.   By reason of the alleged violations of the antitrust laws, plaintiff and the Class have sustained injury to their businesses or property, having paid higher prices for beef than they would have paid in the absence of defendants' illegal contract, combination, or conspiracy and as a result have suffered damages.

121.   This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## IX.   CAUSES OF ACTION

### COUNT I

### Violation of Section 1 of the Sherman Act (15 U.S.C. §§ 1, 3) (Conspiracy in Restraint of Trade)

122.   Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

123.   At least as early as January 1, 2015, defendants and their co-conspirators entered into a continuing agreement in violation of the Sherman Act. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

124.   Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of defendants' affairs.

125.   Defendants' anticompetitive acts involved United States domestic commerce and other commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising, fixing, and maintaining prices for beef throughout the United States.

126.   The relevant product market is beef and the relevant geographic market is the continental United States.

127.   Defendants possess market power in the Relevant Market.

128.   Defendants could impose an increase in the price of beef collectively without causing many consumers and businesses to switch their purchases to another product. Beef constitutes a unique product market.

129.   Defendants view the beef products as fungible. Beef products are generally interchangeable, permitting defendant integrators to readily to compare and match each other's pricing.

130.   The defendants' collusive conduct has had the effect of (1) reducing and suppressing competition among defendants in the market for beef in the United States and (2) inflating the prices of beef during the Class Period.

131.   As a result of defendants' unlawful conduct, plaintiff and the members of the Class have been harmed by being forced to pay inflated, supracompetitive prices for beef.

132.    As a direct and proximate result of defendants' anticompetitive conduct, plaintiff and members of the Nationwide Class have been injured in their business or property and will continue to be injured in their business and property by paying more for beef than they would have paid and will pay in the absence of the conspiracy.

133.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

134.    Plaintiff and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

## COUNT II

### Violation of State Antitrust Statutes
### (on behalf of Plaintiff and the Damages Class)

135.    Plaintiff repeats the allegations set forth above as if fully set forth herein, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

136.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of beef in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

137.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive prices for beef, including in the United States and its territories.

138.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including agreeing to fix, increase, inflate, maintain, or stabilize effective prices of beef purchased by Plaintiff and

members of the Damages Class; and (b) participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

139.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices of beef. As a direct and proximate result, Plaintiff and members of the Damages Class were deprived of free and open competition and paid more for beef than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

140.    In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiff and the members of the Damages Class.

141.    Accordingly, Plaintiff and the members of the Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

142.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations of the following state antitrust statutes.

143.    **Arizona:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Ariz. Rev. Stat. §44-1401, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for beef was restrained, suppressed, and eliminated throughout Arizona; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona. During the Class Period, Defendants' illegal conduct substantially affected

Arizona commerce. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §44-1401, *et seq*.

144.    **California:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Cal. Bus. & Prof. Code §16700, *et seq*.  During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Cal. Bus. & Prof. Code §16720.  Each defendant has acted in violation of Cal. Bus. & Prof. Code §16720 to fix, raise, stabilize, and maintain prices of beef at supracompetitive levels.  The violations of Cal. Bus. & Prof. Code §16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of beef.  For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the price of beef.  The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for beef has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for beef provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) those who purchased beef indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.  As a result of Defendants' violation of Cal. Bus. & Prof. Code §16720, Plaintiff and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to Cal. Bus. & Prof. Code §16750(a).

145.   **District of Columbia:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of D.C. Code §28-4501, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff and members of the Damages Class, including those who resided in the District of Columbia and purchased beef in the District of Columbia, paid supracompetitive, artificially inflated prices for beef, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected commerce in the District of Columbia.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of D.C. Code §28-4501, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under D.C. Code §28-4501, *et seq*.

146.   **Iowa:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code §553.1, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout Iowa; (2) beef prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa.  During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §553.1, *et seq*.  Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Iowa Code §553.1, *et seq*.

147.   **Kansas:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Kan. Stat. §50-101, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout

Kansas; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas.  During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.  Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Kan. Stat. §50-101, *et seq*.

148.  **Maine:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10, § 1101.  Defendants' combinations or conspiracies had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout Maine; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine.  During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Me. Rev. Stat. Ann. tit. 10, § 1104.

149.  **Michigan:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws §445.771, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout Michigan; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan.  During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Mich. Comp. Laws §445.771, *et seq*.

150.  **Minnesota:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Minn. Stat. §325D.49, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct

substantially affected Minnesota commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Minn. Stat. §325D.49, *et seq*.

151.   **Mississippi:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Miss. Code §75-21-1, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Miss. Code §75-21-1, *et seq*.

152.   **Nebraska:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Neb. Rev. Stat. §59-801, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska.   During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Neb. Rev. Stat. §59-801, *et seq*.

153.   **Nevada:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Nev. Rev. Stat. Ann. §598A.010, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout Nevada; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nev. Rev. Stat. Ann. §598A.010, *et seq*.

154.   **New Hampshire:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes Ann. §356:1. Defendants' combinations or conspiracies had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire.  During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §356:1, *et seq*.

155.   **New Mexico:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Mexico Statutes Annotated § 57-1-1, *et seq*.

156.   **New York:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Laws § 340, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout New York; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. The conduct set forth above is a per se

violation of the Donnelly Act, § 340, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under New York General Business Laws § 340, *et seq*.

157.   **North Carolina:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of North Carolina General Statutes § 75-1, *et seq.*  Defendants' combinations or conspiracies had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.   Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Carolina General Statutes § 75-16, *et seq*.

158.   **North Dakota:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of N.D. Cent. Code §51-08.1-01, *et seq.*  Defendants' combinations or conspiracies had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota.  During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under N.D. Cent. Code §51-08.1-01, *et seq*.

159.   **Oregon:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Or. Rev. Stat. § 646.725, *et seq.*  Defendants' combinations or conspiracies had the following effects: (1) beef price competition was restrained, suppressed and eliminated throughout Oregon; (2) beef prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon. During the Class Period, Defendants' illegal conduct had a substantial effect

on Oregon commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Or. Rev. Stat. § 646.780, *et seq*.

160.  **Rhode Island:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-4, *et seq*. The Rhode Island statutes allow actions on behalf of indirect purchasers for conduct during the Class Period.  Defendants' combinations or conspiracies had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island.  During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-11, *et seq*.

161.  **South Dakota:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under South Dakota Codified Laws § 37-1-3.1, *et seq*.

162.  **Tennessee:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Tenn. Code Ann. §47-25-101, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) beef prices were raised, fixed, maintained, and stabilized at

- 55 -

artificially high levels throughout Tennessee.  During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Tenn. Code Ann. §47-25-101, *et seq*.

163.   **Utah:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101*, et seq*.  Defendants' combinations or conspiracies had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout Utah; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, *et seq*.

164.   **Vermont:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of 9 Vermont Stat. Ann. § 2453, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout Vermont; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under 9 V.S.A. § 2465, *et seq*.

165.   **West Virginia:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-3, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia. During the Class Period, Defendants' illegal

conduct had a substantial effect on West Virginia commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under West Virginia Code § 47-18-9, *et seq*.

166. **Wisconsin:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Wis. Stat. §133.01, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Wis. Stat. §133.01, *et seq*.

**COUNT III**

**<u>Violation of State Consumer Protection Statutes</u>**
**<u>(on Behalf of Plaintiff and the Damages Class)</u>**

167. Plaintiff repeats the allegations set forth above as if fully set forth herein, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

168. Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

169. **Arkansas:** Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of Ark. Code Ann. §4-88-101, *et seq*. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which beef was sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. The aforementioned conduct on the part of the Defendants

constituted "unconscionable" and "deceptive" acts or practices in violation of Ark. Code Ann. §4-88-107(a)(10).  Defendants' unlawful conduct had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code Ann. §4-88-107(a)(10) and, accordingly, Plaintiff and the members of the Damages Class seek all relief available under that statute.

170.  **California:** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of Cal. Bus. & Prof. Code §17200, *et seq*.  During the Class Period, Defendants manufactured, marketed, sold, or distributed beef in California, and committed and continue to commit acts of unfair competition, as defined by Cal. Bus. & Prof. Code §17200, *et seq*., by engaging in the acts and practices specified above. This claim is instituted pursuant to Cal. Bus. & Prof. Code §§17203 and 17204, to obtain restitution from these Defendants for acts, as alleged herein, that violated Cal. Bus. & Prof. Code §17200, commonly known as the Unfair Competition Law.  Defendants' conduct as alleged herein violated Cal. Bus. & Prof. Code §17200.   The acts, omissions, misrepresentations, practices and nondisclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of Cal. Bus. & Prof. Code §17200, *et seq*., including, but not limited to, the following: (1) the violations of §1 of the Sherman Act, as set forth above; (2) the violations of Cal. Bus. & Prof. Code §16720, *et seq*., set forth above.  Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not

in violation of Cal. Bus. & Prof. Code §16720, *et seq*., and whether or not concerted or independent acts, are otherwise unfair, unconscionable unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of beef in the State of California within the meaning of Cal. Bus. & Prof. Code §17200 *et. seq.*; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Cal. Bus. & Prof. Code §17200, *et seq*.  Plaintiff and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as a result of such business acts or practices.  The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.  The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiff and the members of the Damages Class to pay supracompetitive and artificially inflated prices for beef.  Plaintiff and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.  The conduct of Defendants as alleged in this Complaint violates Cal. Bus. & Prof. Code §17200, *et seq*.  As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition.  Plaintiff and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to Cal. Bus. & Prof. Code §§17203 and 17204.

171.    **Florida:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201, *et seq*.  Defendants' unlawful conduct had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout Florida; (2) beef prices were

raised, fixed, maintained, and stabilized at artificially high levels throughout Florida. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. Accordingly, plaintiff and members of the Damages Class seek all relief available under Fla. Stat. §501.201, *et seq*.

172. **Minnesota**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq*. Defendants engaged in unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiff as a purchaser of the Defendants' goods, and which caused Plaintiff to suffer injury. Defendants took efforts to conceal their agreements from Plaintiff and the members of the Damages Class. Defendants' unlawful conduct had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and beef purchasers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute and as equity demands.

173. **Missouri:** Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq*. Defendants engaged in the conduct described in this Class Action Complaint in connection with the sale of products containing beef in Missouri. During the Class Period, Defendants' illegal conduct substantially affected Missouri commerce and consumers. Defendants agreed to, and in fact did, fix, control, and maintain at artificial and non-

competitive levels, the price at which beef was sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive, and unscrupulous, and caused substantial injury to Plaintiff and the members of the Damages Class. Defendants concealed, suppressed, and failed to disclose material facts to Plaintiff and the members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for beef. The concealed, suppressed, and omitted facts would have been important to Plaintiff and the members of the Damages Class as they related to the cost of products containing beef. Defendants' unlawful conduct had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout Missouri; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiff and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and the members of the Damages Class paid supracompetitive, artificially inflated prices for products containing beef. The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act. As a direct and proximate result of the above-described unlawful practices, Plaintiff and the members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiff and the members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce," as further interpreted by the Missouri Code of State Regulations, which provides for the relief sought in this Count.

174.  **Nebraska**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq*. Defendants' unlawful conduct had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants marketed, sold, or distributed beef in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and beef purchasers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

175.  **New Hampshire**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq*. Defendants sold beef in New Hampshire and deceived Plaintiff and Class Members in New Hampshire into believing that the beef were competitively priced. Defendants' unlawful conduct had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiff and members of the Damages Class, who resided in New Hampshire and/or purchased the beef in New Hampshire were deprived of free and open competition in New Hampshire; and (4) Plaintiff and members of the Damages Class, who resided in New Hampshire and/or purchased beef in New Hampshire paid supracompetitive, artificially inflated prices for beef in New Hampshire. During the Class Period, Defendants marketed, sold, or distributed beef in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire

commerce and beef purchasers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

176.   **New Mexico:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.* In New Mexico, price-fixing is actionable as an "unconscionable trade practice" under N.M. Stat. § 57-12-2(E) because it "takes advantage of the lack of knowledge … of a person to a grossly unfair degree" and also results in a "gross disparity between the value received by a person and the price paid." Defendants had the sole power to set that price, and Plaintiff and members of the Damages Class had no meaningful ability to negotiate a lower price from wholesalers. Moreover, Plaintiff and members of the Damages Class lacked any meaningful choice in purchasing beef because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiff and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of beef, including their illegal conspiracy to secretly fix the price of beef at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiff and the public. Defendants took grossly unfair advantage of Plaintiff and members of the Damages Class. Defendants' unlawful conduct had the following effects: (1) beef price competition was restrained, suppressed and eliminated throughout New Mexico; (2) beef prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and

(4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for beef.  During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

177.  **New York:**   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which beef were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. Defendants and their co-conspirators made public statements about the prices of beef that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for beef; and Defendants alone possessed material information that was relevant to consumers and businesses, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased beef were misled to believe that they were paying a fair price for beef or the price increases for beef were for valid business reasons; and similarly situated consumers and businesses were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing beef would have an impact on New York consumers and businesses and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to

pricing beef would have a broad impact, causing commercial and institutional indirect purchaser class members who indirectly purchased beef to be injured by paying more for beef than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of customers and commercial and institutional indirect purchasers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout New York; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for beef. During the Class Period, Defendants marketed, sold, or distributed beef in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed beef in New York. Plaintiff and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

178. **North Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.C. Gen. Stat. §75-1.1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which beef were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements

from Plaintiff and members of the Damages Class.  Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts.  Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy.  Defendants committed inherently deceptive and self-concealing actions, of which Plaintiff could not possibly have been aware.  Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases.  The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and injury to commercial and institutional indirect purchasers along with broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers and commercial and institutional indirect purchasers in an honest marketplace in which economic activity is conducted in a competitive manner.  Defendants' unlawful conduct had the following effects: (1) beef price competition was restrained, suppressed and eliminated throughout North Carolina; (2) beef prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for beef. During the Class Period, Defendants marketed, sold, or distributed beef in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed beef in North Carolina.  Plaintiff and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in

violation of N.C. Gen. Stat. §75-1.1, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

179.   **North Dakota**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which beef was sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for beef. Defendants misrepresented to all purchasers during the Class Period that Defendants' beef prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for beef was restrained, suppressed, and eliminated throughout North Dakota; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and beef purchasers. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of beef, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing beef at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities

constitute violations of N.D. Century Code § 51-15-01, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

180.   **Rhode Island:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act (R.I. Gen. Laws § 6-13.1-1, *et seq.*) Members of the Damages Class purchased beef for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which beef were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for beef. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' beef prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for beef. Defendants' illegal conduct substantially affected Rhode Island commerce and consumers, including commercial and institutional indirect purchasers that serve as a conduit to consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use

or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of beef, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing beef at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiff and members of the Damages Class as they related to the cost of beef they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

181. **South Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §39-5-10 *et seq*. Defendants' combinations or conspiracies had the following effects: (1) beef price competition was restrained, suppressed and eliminated throughout South Carolina; (2) beef prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Carolina. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §39-5-10 *et seq.*, and, accordingly, Plaintiff and the members of the Damages Class seek all relief available under that statute.

182.   **South Dakota**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which beef was sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for beef. Defendants misrepresented to all purchasers during the Class Period that Defendants' beef prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for beef was restrained, suppressed, and eliminated throughout South Dakota; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota. Defendants' illegal conduct substantially affected South Dakota commerce and on those who purchased beef in South Dakota. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of beef, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing beef at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiff and members of the Damages Class as they related to the cost of beef they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq*., and,

accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

183.   **Vermont:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont Stat. Ann. § 2451, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which beef were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for beef. Defendants owed a duty to disclose such facts, and Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' beef prices were competitive and fair. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of beef, likely misled all commercial and institutional indirect purchasers acting reasonably under the circumstances to believe that they were purchasing beef at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

184. **Wisconsin**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which beef was sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' beef prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for the beef was restrained, suppressed, and eliminated throughout Wisconsin; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. Defendants' illegal conduct substantially affected Wisconsin commerce and purchasers of beef. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of beef at issue, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing beef at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiff and members of the Damages Class as they related to the cost of beef they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

**COUNT IV**

**Unjust Enrichment[87]**
**(on behalf of Plaintiff and the Damages Class)**

185.     Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.

186.     To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

187.     Defendants have unlawfully benefited from their sales of beef because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged privately held commercial and institutional indirect purchasers, which purchased beef at prices that were more than they would have been but for Defendants' unlawful actions.

188.     Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiff and members of the Damages Class.

189.     Plaintiff and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiff and the Damages Class.

190.     Defendants have been enriched by revenue resulting from unlawful overcharges for beef while Plaintiff and members of the Damages Class has been impoverished by the overcharges they paid for beef imposed through Defendants' unlawful conduct.  Defendants' enrichment and the impoverishment of Plaintiff and members of the Damages Class are connected.

---

[87] Unjust enrichment claims are alleged herein under the laws of the states for which claims are alleged in Counts Two and Three above.

191.    There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiff and the Damages Class, because Plaintiff and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

192.    Plaintiff did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

193.    The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of beef.

194.    The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of beef are ascertainable by review of sales records.

195.    It would be futile for Plaintiff and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiff and the Damages Class with respect to Defendants' sales of beef.

196.    It would be futile for Plaintiff and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased beef, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiff and the Damages Class for Defendants' unlawful conduct.

197.    The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for beef is a direct and proximate result of Defendants' unlawful practices.

198.    The financial benefits derived by Defendants rightfully belong to Plaintiff and the Damages Class, because Plaintiff and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

199.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories of the United States, except California, Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for beef derived from Defendants' unlawful, unfair, and unconscionable methods, acts, and trade practices alleged in this Complaint.

200.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiff and the Damages Class.  Defendants consciously accepted the benefits and continue to do so as of the date of this filing, as beef prices remain inflated above pre-conspiracy levels.

201.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff and the Damages Class all unlawful or inequitable proceeds they received from their sales of beef.

202.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of beef by Plaintiff and the Damages Class.

**REQUEST FOR RELIEF**

WHEREFORE, plaintiff, on behalf of itself and the Class of all others so similarly situated, respectfully requests judgment against defendants as follows:

- 75 -

203.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint plaintiff as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

204.    The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; (b) a *per se* violation of Section 1 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; or, alternatively, (d) acts of unjust enrichment by Defendants as set forth herein.

205.    Plaintiff and the Class recover damages, to the maximum extent allowed under the applicable state laws, and that a joint and several judgments in favor of plaintiff and the members of the Damages Class be entered against defendants in an amount to be trebled to the extent such laws permit;

206.    Plaintiff and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

207.    Plaintiff and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiff and members of the Damages Class may make claims on a *pro rata* basis;

208.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

209.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

210.    Plaintiff and the members of the Damages Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

211.    Plaintiff and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

212.    Plaintiff and the members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## JURY TRIAL DEMANDED

213.    Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated:  June 18, 2020                    Respectfully submitted,

                                         **LARSON · KING LLP**

                            By:   */s/ Shawn M. Raiter*
                                         Shawn M. Raiter (MN#240424)
                                         30 East Seventh Street
                                         Suite 2800
                                         St. Paul, MN 55101
                                         Telephone: (651) 312-6518
                                         sraiter@larsonking.com

                                         Don Barrett (to apply *pro hac vice*)
                                         Katherine Barrett Riley (to apply *pro hac vice*)
                                         David McMullan (to apply *pro hac vice*)
                                         **BARRETT LAW GROUP, P.A.**
                                         P.O. Box 927
                                         404 Court Square North
                                         Lexington, Mississippi 39095-0927
                                         Telephone: (662) 834-9168
                                         Facsimile: (662) 834-2628
                                         Email: donbarrettpa@gmail.com
                                         Email: kbriley@BarrettLawGroup.com
                                         Email: dmcmullan@BarrettLawGroup.com

                                         Jonathan W. Cuneo (to apply *pro hac vice*)
                                         Blaine Finley (to apply *pro hac vice*)
                                         **CUNEO GILBERT & LADUCA, LLP**
                                         4725 Wisconsin Ave., NW
                                         Suite 200
                                         Washington, DC 20016
                                         Telephone:  (202) 789-3960
                                         Email:  jonc@cuneolaw.com
                                         Email:  bfinley@cuneolaw.com

                                         *Counsel for Plaintiff and the Proposed Classes*